THOMAS et al. *v.* STIGERS et al.

The courts will take notice of the agreement between Lord Baltimore and Penn, relating to the boundary line of the two provinces.

This agreement embraced all titles completed before 1768, as well those perfected in 1760, as the inceptive right, under the custom of Maryland, to embrace other land in a resurvey under an order, after patent granted on the former survey.

In 1753, a Maryland warrant for one hundred and fifty acres issued, on which a survey was made, and a patent for ten acres was obtained in 1754. An order of re-survey issued, including a contiguous vacancy, and to take in land included in the warrant of 1753, on the return of which a patent issued. In 1765, another order of re-survey issued, was executed, and a patent obtained. The title to part

of this land, within the state of Pennsylvania, although it did not appear to have been included within any of the previous surveys or patents, was held to be protected by the agreement of 1760 between the Maryland and Pennsylvania proprietaries.

And where the defendant had shown title from those in possession fifty years before the trial, the want of evidence of a conveyance from the Maryland patentee does not affect his right to set up that title.

In error from the Common Pleas of Bedford.

June 10. The question in this case was on the validity of an ancient Maryland grant. The plaintiffs had a warrant, (said to be descriptive,) dated April 6th, 1842, and surveyed on the 30th. On the 24th April, the defendants commenced an improvement, and had a warrant dated and surveyed in May, 1842. Their title rested therefore on the following facts.

In 1753 a warrant issued from the Maryland land-office to Evan Shelly for one hundred and fifty acres in Frederick county. An order then issued to survey ten acres of this, to John Polk. This was executed in the same year and returned in 1754, "Polk's Venture, ten acres, beginning at a bounded white oak and Stilwell's branch, one-quarter mile below Rogers's run, on the south side of great Tonolloway Branch, No. 1." Under a written authority from Shelly, a patent issued, February 25, 1754, to Polk. On the same day an order of resurvey issued. In March, the return was made, adding "contiguous vacancy, containing six hundred and seventy acres." In February, 1759, an order issued to resurvey this tract, and to take in "contiguous vacancy to Evan Shelly's Ranger's Venture." In March, 1761, this was returned ten hundred and twenty acres, and on the same day a patent for this tract issued to Shelly. On the 15th February, 1765, there was an order to resurvey "Ranger's Venture" issued to Joseph Warford. On the 10th October of the same year, the land was resurveyed as "Caledonia," and the purchase-money paid. On the 31st a patent issued to G. Frazier Hawkins for three thousand nine hundred and ten acres, for "Caledonia," including three hundred and ninety-eight acres of "Ranger's Venture."

The land in dispute lies within the limits of the Caledonia tract, but whether it was included in any of the prior surveys, &c., did not appear. It was shown that one Stevenson lived there forty-five years ago, and Yeater before 1812, and that it had been farmed ever since. A witness proved title-bonds for the land given in 1795 to McConnell, and that the witness's brother then lived on the land. In that year McConnell conveyed to Breathed, who in 1823 conveyed to the defendant Thomas. Evidence was rejected

of declarations by the present and the three previous owners, that they claimed the land under the Hawkins patent, but that no conveyance from Hawkins was known in the family of the Breatheds, (who were the owners in 1795.)

The plaintiffs, in rebuttal, proved there were seventy-five or eighty acres cleared, but no building was on the premises until 1842, as above stated.

The court (BLACK, P. J.) instructed the jury that the agreement between Penn and Lord Baltimore, in 1760, confirmed grants to the north of the line, made *before* that time; that the title to "Polk's Venture" and "Ranger's Venture," so far as they lie within this state, are protected; but that the Caledonia patent could not relate further back than the order of resurvey, and that, being five years subsequent to the agreement, was void, and the land vacant when the plaintiff obtained his warrant.

The rejection of the evidence, and the charge, were the errors assigned.

*Barclay* and *Thompson,* for plaintiff in error.—There are two points in the cause, either of which will support the Maryland title. The last agreement between the proprietaries was on the 4th July, 1760, but the line there agreed upon was not established until the survey by Mason and Dixon, confirmed by the king in council in 1769; and this was not known to the people until the proclamation, in 1774.

The first question is, whether there was a title before 1760? By the usages and law of Maryland, this title commenced with the first warrant in 1753, for it is apparent the owner of that warrant, or the patentee, had the right of extending his claim by subsequent orders of resurvey, even after the patent issued. This right was an incident to the title. And when the agreement was made, it was confirmed; for when the contest between the governments was settled, the citizens of each country were protected in the rights they had previously acquired.

But if there was no right against Pennsylvania under the early warrant, yet the last warrant and patent are within the meaning of the agreement, if properly construed. It was doubtless intended to protect purchasers until the line was ascertained, and known to the people. Such has been the construction by Maryland in the act of 1785, c. 66, § 7. The agreement in 1738 we have discovered in the Secretary of State's office, book K, 60, 61, and it rules this case. Taking into consideration the long posses-

sion of the defendants, it cannot be that this state can seek to re-grant it as vacant land.

*Lyon,* contrà.—The only point in this case arises upon the construction which may be given to the agreement made between the proprietors of Pennsylvania and Lord Baltimore, dated the 4th of July, 1760. A mere pretended claim or right set up for land in Pennsylvania, under the authority of the state of Maryland, commencing subsequently to the 4th of July, 1760, confers no title against a party claiming under warrant and survey issued, and made under Pennsylvania authority; Ross *v.* Cutshall, 1 Binn. 399; 2 Smith's Laws, 135. It was valid rights then existing that were thereby protected.

*June* 19. COULTER, J.—The plaintiffs below gave in evidence a special warrant for the land in dispute, dated 6th April, 1842; survey dated the 30th of April, of the same year; and it was admitted that the defendants were in possession.

The defendants exhibited in evidence a warrant for the land which they claim, dated 5th of May, 1842, for one hundred and thirty-five acres, and a survey made on the 7th of the same month and year, for one hundred and thirteen acres. The court below assumed it as a fact, that the plaintiffs' warrant described the land specially, and although neither the warrant itself nor a copy of it is attached to the paper-book, or certified with the record, and therefore, under a rule of this court, it would not be entitled to notice or regard, yet I admit the fact, and on that basis, although the survey of the defendant were prior in date to that of the plaintiff, yet the title of the latter would prevail under the Pennsylvania grants. But the defendant mainly relies upon a grant from the state of Maryland, duly perfected by patent, and although he has not been able to trace that title to himself by reason of the loss of an ancient deed, yet the patent from the state of Maryland, if good, will defeat the plaintiff, as it is admitted to embrace the land in dispute. [His honour then stated the warrants, surveys and patents already mentioned.] This new and final survey, (of the Caledonia tract,) on which a patent was granted to Frazier Hawkins, on the 31st October, 1765, did not embrace the whole of Ranger's Venture, and took in a large portion of land not covered by it.

The practice of the land-office in the province of Maryland was peculiar, and widely different from ours. But although it may appear anomalous, we must judge of it according to the laws and customs of the state of Maryland, and if the whole of Caledonia

had fallen within the limits of that state, as finally settled, the title would have been good.

It was not the custom in the early history of the land-titles in Maryland, to mark the lines on the ground. Nothing was marked but the place of beginning, which was called the "bounded tree," and I presume it was necessary in all their resurveys, to commence at this "bounded tree" to mark the identity and continuity of the title. The paper-book is so meagre as to allow me to assert with some hesitation that such was the fact here. It appears, however, that part of the original survey was included in the final one, and that final survey was made up of land which, upon the final settlement of the border, fell partly in Maryland and partly in Pennsylvania, the land in dispute being on the Pennsylvania side, and embraced certainly by the Caledonia survey, but it is not apparent on the paper-book whether it was embraced by the survey of Ranger's Venture or not. This title must be considered as originating in 1653, and good against the state of Maryland for all the land embraced in the Caledonia survey, unless an appropriation of what they call "contiguous vacancy" had been made by an opposing survey after the first return and before the final resurvey; that was not done here.

In order to ascertain the value of the Maryland title, it will be necessary to trace succinctly the history of the border controversy between this state and Maryland.

For the purpose of terminating the dispute, an agreement was entered into between Lord Baltimore and the proprietaries of this province, dated the 10th of May, 1732. The border east of the Susquehanna at that time, and long afterwards, gave the most trouble. Difficulties arose in carrying out this agreement, and in the year 1733, the commissioners appointed to fix the line reported to their respective governments that they could not agree. William Penn filed a bill in chancery to compel specific execution of the agreement, and in 1750, the Lord Chancellor Hardwicke decreed specific performance, in an elaborate opinion, observing that "the great importance and consequences of the cause being for the determination of the rights and boundaries of two great provincial governments, and of a nature worthy of the judicature of a Roman Senate rather than of a single judge, had induced him to let the cause stand over for judgment." In pursuance of this decree, the proprietaries, on the 4th of July, 1760, entered into a new article of agreement, and designation of boundaries. But the line was not actually run until 1768, as the late Judge Charles Smith asserts in his edition of the laws of this state, although Proud, in his history of Pennsylvania,

states that it was made in 1762, which, I have no doubt, however, is a mistake, because the line was finally run by the indefatigable exertions of the families or settlers on the eastern section, and their instant and urgent importunities with the proprietaries, who employed two individuals who had been distinguished only by their skill in mathematical science, and who, by their finally settling that line, gave their names to history as fixing the borders between liberty and slavery on this great continent. But as they were not employed until after they became conspicuous upon their return from Africa, whither they had gone to observe the transit of Venus, which occurred in June, 1761, they could not have made the survey so early as 1762, although they might have been employed in that year to perform the service. The time of running this line is important in this cause.

The line run by Mason and Dixon was approved by the king in council, on the 11th of January, 1769, upon the petition of Lord Baltimore and the proprietaries of this state, in which petition the survey and marking of the line by stone pillars is set forth. On the 15th September, 1774, the proprietaries issued their proclamation to the inhabitants of this state, setting forth the agreement of May 10, 1732, the decree of the Lord Chancellor, and the agreement of 1760, the running and marking the line, and the order in council, all of which are before referred to, and directing all the inhabitants on the Pennsylvania side of the border to be obedient to the laws of the province. The legislature of Maryland, on the —— day of November, 1785, (2 Maryland Laws, Kiltey's ed. ch. 66, 1 Dorsey, 205,) passed a law confirming and making valid all titles to lands which were granted and patented by the state of Pennsylvania, before the running and settling of the divisional line, and which, by that line, fell within the limits of the province or the state of Maryland, and directed the land-offices to issue patents for the same without charge, except the office fees. Whatever might have been the obliquity of the commissioners of the province of Maryland, for the purpose of settling the line under the agreement of 1732, and which was severely rebuked by Lord Hardwicke in the decree which I have stated, this law was an atonement, and evinced a spirit of high rectitude and good faith on the part of that respectable state. The agreement of 1760 cannot now be produced. It was not produced on the trial of this cause below. But it was in the office of the Secretary of State at the time of preparing the edition of the laws edited by Judge Smith, as he states in his notes. It was produced on the trial of the case of Ross's Lessee *v.* Cut-

shall, in Bedford county, in 1806, which came up to this court on writ of error, and to which reference will hereafter be made. It seemed to be admitted on the argument of the cause at bar, that it could not be found. I have myself made diligent inquiry for it in the office of the Secretary of State and in the Land-Office, without success. Tradition says it was claimed by an individual as private property. Perhaps it was taken out of the office for the purpose of being used in some legal investigation, and never returned. Under these circumstances, it becomes a grave question how far it ought to be regarded by the courts, and its contents ascertained from other reliable sources. In this aspect of the matter, it may be stated, that if the document itself was produced, it would be impossible to authenticate it. Doubtless it would be covered with the yellow rust of time, but that is not legal proof. Who could now prove the signature of Lord Baltimore, in the form that would make it legal testimony, according to the rule of evidence by which deeds of individuals are established? But its legal existence is established by the proclamation of the proprietaries, to which I have before adverted, and which is recorded in the Capitol (Council-Book U, p. 466.) It is chronicled in Proud's history of this state; it is reported as existing in the case in 1 Binn.; and its existence, and much of its contents are preserved in 2 Smith's Laws, 134, 135; and the material part of its contents, so far as this case is concerned, is recited in the Maryland statute to which I have referred; and also in the report of the case of Ross v. Cutshall. In truth, it has passed into the public history of the state, and the chronicles of its laws, and must be regarded by the courts, who are bound to take notice, as well of the foundation as the superstructure of the laws.

It might, with as much seeming propriety, be required, that the charter to William Penn should be produced and authenticated in our courts, before the muniments of his grants could be received in evidence. I take then from the report of the case of Ross v. Cutshall, 1 Binn. 399, where the paper was in evidence, so much of it as is material, "provided, that this release shall not extend to any right of any grantee now in the actual possession of any such grantee, which have been at any time, or in any manner heretofore granted by or under the authority of Lord Baltimore. But it shall be lawful for such tenants and occupiers, their heirs, &c., to hold such lands paying quit-rents to the proprietors of Pennsylvania." A similar reservation was contained with respect to the lands falling within the limits of Maryland; and each government was to account with the other for purchase-money of the lands granted by

either, and which should happen on the final designation of boundary to be within the limits of the other. To explain the uncertainty of the boundary, it is only necessary to mention, that in the respective charters, and particularly in the first agreement of 1732, certain geometrical boundaries were fixed, which could give the people along the border no actual information, or definite instruction as to the line of ultimate demarcation, within the range of several miles. We have stated how the legislature of Maryland quieted the controversy on her side of the border. No corresponding law has been passed by the legislature of our state, because I presume it was deemed unnecessary, as the faith of the Commonwealth and its public documents afforded ample security to holders of grants under Maryland, which came within the range of the agreement of 1760.

The court below instructed the jury, that the Caledonia patent was an absolute nullity, because the order of re-survey upon which it was founded was issued after the date of the agreement of 1760, but that "Polk's Venture" and "Ranger's Venture" would have been good. This is the error complained of. The court further say, "that inasmuch as this Maryland title could not avail the defendant under any circumstances, we have adopted the opinion of the defendant's counsel, (doubtful though it be,) that we were bound to take judicial notice of the agreement between the Penns and Lord Baltimore, though not produced."

It will be observed, that the state of Maryland adopted the construction, that the Pennsylvania titles within her limits were good, if perfected before the actual designation and marking of the boundary; and this was the interpretation of good faith and honesty.

In this case, the Caledonia title was perfected by patent before the commencement of the running of the line, to wit, 1765. How could the inhabitants or settlers ascertain or fix the geometrical line? How could the governments of the respective provinces tell its exact location? The settlement of the country would, therefore, have been brought to a dead pause, unless the inception of titles before 1760, and their completion before the line was known, was thought, at the time, to have been within the benefit of the agreement. But the court below would make a resurvey made after 1760, void as against this state, even although at the time it was supposed to be within the limits of Maryland. This construction would accord as ill with reason and good sense as it does with good faith. For what purpose was the reservation introduced into the agreement? Certainly for the purpose of preventing settlers

from paying both governments for the land, and also to encourage the progress of settlement.   But of what use would it be to make a line between the inception of the title and its completion.   The applicant took out an inception of title in the state of Maryland, because he believed the land would fall within her limits; and the agreement of 1760 gave him no more information than he had previously.   It was still the same geometrical limits as in the agreement of 1732.   If he was permitted to commence the title on this uncertainty, does not justice require that he should be permitted to complete it whilst the same uncertainty existed; and that same uncertainty did exist until the demarcation of the line in 1768.

The reservation in the agreement is as to lands "which have been at any time or in any manner heretofore granted," words capacious and large enough to cover grants by warrant though not completed, or the more loose kind of grant recognised by us, of location and survey.   The true interpretation, therefore, to be put upon the agreement, is the one adopted by the state of Maryland, to wit, that the agreement embraced all cases, the inception of title whereof commenced prior to 1760, and which were completed or consummated before the final designation of boundary in 1768.

Did this title of the Caledonia patent commence before 1760 ? How can that be legally doubted?   The practice of the Land-Office in Maryland in several particulars, may appear anomalous, because it accords not with our own.   But it had its own mode, which must be respected by us.   It is clear, that by the customs of that state, the Caledonia resurvey and patent was a continuation of the " Ranger's Venture," because the latter included a great part of the former, and the connection and identity is kept up by the resurvey on the papers themselves from the warrant granted to Evan Shelly in 1753.   And if the laws of Maryland regarded the title as good against that state, we must in good faith regard it as good against Pennsylvania, and let her look to Maryland under the agreement of 1760, for the purchase-money.   Our own resurveys date back to the inception of title, unless intervening rights are interposed; and if an intervening right granted by the Commonwealth of Pennsylvania had interposed after the survey on " Ranger's Venture," and before the resurvey on Caledonia, that might have made a very material difference.   But the order of resurvey on the " Ranger's Venture," and which resulted in the patent of Caledonia, was to include " contiguous vacancy" according to their peculiar legal phraseology, but sufficiently indicative of the honesty of intention. The resurvey of Caledonia and patent, is but the consummation

and completion of a title, before the final designation of boundary, which had commenced before 1760, and would have been a good and valid title from the state of Maryland, or rather province, if it had fallen within her limits, and therefore we must regard it as good and valid against the state of Pennsylvania. This is giving fair effect to an agreement entered into between the provinces, out of paternal solicitude for the peace and tranquillity of the border inhabitants, the furtherance of their industrial pursuits, and the preservation of peace and good will between two great states of the Anglo-saxon race.

The case of Ross v. Cutshall, 1 Binn. 399, cited by the plaintiff below, is against him. In that case, the opinion of the court in granting a new trial is clearly expressed, that if the renewed warrant of 1762 was for the same land as the old warrant, which was issued on the 1st of February, 1760, it would be good. The old warrant was in that case abandoned, without survey or any other act to give it life, and a renewed warrant taken out. Even there the court said, if it had been surveyed on the same land called for in the old warrant, they would have held the survey and patent on the renewed warrant good. But a new trial was granted, because, in the opinion of the court, the survey on the renewed warrant was on land altogether different.

In the case at bar, part of the land is included in every resurvey, particularly of Ranger's Venture, and in the absence of the drafts, none of which are attached to the record; I presume the original "bounded tree," as it is called in Maryland, bounds all the resurveys.

I feel the more confidence in the case at bar being ruled on the principles I have stated, because it will aid and sustain the private right and equity of one party, and do no real injury to any one. The defendant below proved on the trial, that the land in dispute had been possessed and occupied by him, and those under whom he claims for a period of forty or forty-five years; an era or point of antiquity to which I know it is hard to reach by testimony. Eighty acres of the hundred and thirteen in dispute have been cleared and cultivated, and although there is no dwelling on the land, the owner must have a dwelling in some place, which may be presumed to be some place near, and across the line in Maryland. The sweat of the brow has fallen on the land, and people have regarded it as their home, resting with confidence on the Maryland title, and the faith of our state. When after the lapse of long years of undisturbed possession, some individual, fond of delving into the for-

gotten things of the world, supposed he could start the plaintiff on the hunt of concealed treasure; and in the hour of security and peace, the defendant is aroused by the warrant and survey in 1842. He at once, to show that he was willing to pay the Commonwealth rather than lose his home, takes out a warrant from this state, and has it executed on the Maryland title. Every true son of the state beholds its unblemished honour and high good faith with reverential and filial affection; and it is the duty of this court to protect and defend it. We think the court below erred in their instruction to the jury on the subject of the Maryland title, which instruction was all excepted to.

Judgment reversed, and a <em>venire de novo</em> awarded.